UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

**ROBERT J. R.,**

**Plaintiff,**

    v.

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant**.

Case No. 1:19-cv-0627-TPK

**OPINION AND ORDER**

## OPINION AND ORDER

    Plaintiff filed this action under 42 U.S.C. §405(g) asking this Court to review a final decision of the Commissioner of Social Security. That final decision, issued by the Appeals Council on March 16, 2019, denied Plaintiff's application for supplemental security income. Plaintiff has now moved for judgment on the pleadings (Doc. 10), and the Commissioner has filed a similar motion (Doc. 14). For the following reasons, the Court will **DENY** Plaintiff's motion for judgment on the pleadings, **GRANT** the Commissioner's motion, and direct the Clerk to enter judgment in favor of the Defendant.

### I. BACKGROUND

    On February 10, 2016, Plaintiff protectively filed his application for benefits, alleging that he became disabled on that date. After initial administrative denials of his claim, Plaintiff appeared at an administrative hearing held on April 30, 2018. Both Plaintiff and a vocational expert, Jay Steinbrenner, testified at that hearing.

    The Administrative Law Judge issued an unfavorable decision on August 1, 2018. He first concluded that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. Next, he found that Plaintiff suffered from severe impairments including a seizure disorder, bipolar disorder, post-traumatic stress disorder, and a personality disorder. He further determined that these impairments, viewed singly or in combination, were not of the severity necessary to qualify for disability under the Listing of Impairments.

    Moving on to the next step of the inquiry, the ALJ found that Plaintiff had the residual functional capacity to perform a full range of work at all exertional levels. However, he could not work at unprotected heights or around dangerous machinery, tools, or chemicals. He was capable of simple, repetitive one and two-step tasks but not complex work which would involve multiple simultaneous goals or objectives or would require the ability to set quantity, quality, or methods standards on an independent basis. He also could not work in tandem with more than

nine people, and he should avoid public contact but could interact occasionally with co-workers and supervisors.

The ALJ next determined that Plaintiff had no past relevant work. According to the testimony of the vocational expert, a person with Plaintiff's residual functional capacity could perform jobs like hand packager and warehouse worker, and the ALJ so found. The ALJ therefore concluded that Plaintiff was not under a disability as defined in the Social Security Act.

Plaintiff, in his motion for judgment, asserts this claim: "The ALJ's mental RFC determination was not supported by substantial evidence." Doc. 10, at 1. As part of that claim, he argues that the ALJ relied inappropriately on a stale opinion from a non-examining source, failed to explain how the residual functional capacity finding was consistent with the opinion of the examiner whose opinion was given substantial weight, and failed to make an individualized review of Plaintiff's stress tolerance.

## II. THE KEY EVIDENCE

The Court will begin its review of the evidence by summarizing the testimony from the administrative hearing. It will then provide a summary of the most important medical records.

Plaintiff (who had been incarcerated for a number of years, having been released in 2012, and who was 43 years old when he filed his applications) began his testimony by explaining why he was unable to work. He said he had very severe anxiety and a fear of being around people. He also suffered from flashbacks and seizures, which occurred several times per week. Environmental factors such as odors and smoke also affected his breathing. Plaintiff also referred to problems with his memory and focus, and said he could not deal with stress at all. He had bad days and worse days, and on bad days, which occurred six days out of seven, he drank or slept. Additionally, he had migraines or headaches every day, suffered from lack of sleep and nightmares, and was depressed to the point of having attempted suicide in the past. The depression was part of his bipolar disorder, as was hearing voices.

When asked what he did on a daily basis, Plaintiff said that he watched television or wrote songs. He had recently quit smoking. He also testified that he had had a bad seizure after not taking his medication and that he had taken it consistently since then. However, he still had occasional seizures. He was able to shop for groceries and cooked occasionally. Plaintiff could also go to medical appointments by himself. Although he had a bad back, he did not think that he had any physical issues that would prevent him from working.

The vocational expert, Mr. Steinbrenner, was asked to assume that Plaintiff had no past work and that he had no exertional limitations. He was then asked to testify about a person who had various mental and non-exertional limitations which would essentially limit him to simple, repetitive tasks and to no public contact and only occasional contact with others in the workplace. In response, he identified two jobs that such a person could do, including hand packager and warehouse worker. He also gave numbers for those jobs as they existed in the

national economy.  Those jobs allowed for a worker to be off task for 15% of the time and to miss fewer than two days per month on a consistent basis.

The pertinent medical records show, first, that Plaintiff was diagnosed in 2015 with partial complex seizure disorder without intractable epilepsy, and that he continued to have seizures but was also noncompliant with his medications.  He also began psychological counseling in 2015 with a diagnosis of chronic adjustment disorder with anxiety and depression.  He was drinking to excess at that time.  On examination, there was no evidence of psychosis and he had adequate insight and judgment.  He was able to concentrate but exhibited a depressed and dysphoric mood.  Medication was prescribed and he was advised to continue with counseling.  His GAF as of the first assessment was rated at 51.  Subsequent treatment notes added diagnoses of post-traumatic stress disorder and bipolar disorder as well as antisocial personality disorder and borderline personality disorder.  They also showed that he was having suicidal thoughts and was emotionally fragile, but indicated that his memory was intact.  His treatment continued until September, 2016, when the Niagara County Department of Mental Health discharged him as a patient due to chronic noncompliance with appointments and continued demonstration of resistance when in sessions.

Dr. Ippolito, a psychologist, performed a consultative evaluation on April 8, 2016.  Plaintiff reported having recently obtained his GED.  He had been hospitalized in the past for psychological disorders and had been receiving mental health treatment as an outpatient.  According to Plaintiff, he was depressed and suffered from episodes of anger and anxiety including panic attacks.  He had both auditory and visual hallucinations and described memory and concentration deficits.  He was cooperative during the examinations but appeared depressed and anxious.  Plaintiff's attention and concentration was impaired due to limited intellectual functioning and his memory was impaired due to emotional distress.  Dr. Ippolito believed that Plaintiff could understand and follow simple instructions, do simple tasks independently, maintain a regular schedule, and maintain attention and concentration.  However, she said he "can relate adequately with others and appropriately deal with others with marked limitations." She concluded that his psychological issues would also "significantly interfere with the claimant's ability to function on a daily basis." (Tr. 270-74).  A state agency reviewer concurred that Plaintiff could handle simple instruction and maintain adequate attention and concentration, but thought that he could socialize enough with others to meet basis work needs and could cope with minor changes in the workplace. (Tr. 62-64).

Late in 2016, Plaintiff was hospitalized to treat an overdose which was seen as a suicide attempt.  When seen after discharge, Plaintiff said his mood was improved and he no longer had suicidal thoughts.  His condition continued to improve through his annual physical conducted in February, 2017, and a screening for depression done in May of that year was negative.  He reported no problems in sleeping and had a cooperative attitude at examinations throughout the year.  In the meantime, he began seeing a new mental health provider, Horizons Corporation, who did an initial assessment on November 4, 2016.  At that time, Plaintiff reported significant symptoms of depression including difficulty falling asleep.  At appointments throughout 2017, he demonstrated anxiety and loss of focus and memory, but he also missed a number of

scheduled sessions. He was discharged from that program on July 18, 2017, because he needed a higher level of care, including treatment for a substance abuse disorder. Such treatment apparently began later that year. Another treatment note from December, 2017, shows that Plaintiff was reporting both depression and anxiety, with the former more severe than the latter. He appears to have continued to drink alcohol throughout the treatment process. The last note, dated April 20, 2018, indicated that he reported that his symptoms were "at bay." (Tr. 862).

### III. STANDARD OF REVIEW

The Court of Appeals for the Second Circuit has stated that, in reviewing a final decision of the Commissioner of Social Security on a disability issue,

> "[i]t is not our function to determine de novo whether [a plaintiff] is disabled." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Instead, "we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.2009); *see also* 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").
>
> Substantial evidence is "more than a mere scintilla." *Moran*, 569 F.3d at 112 (quotation marks omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. (quotation marks omitted and emphasis added). But it is still a very deferential standard of review—even more so than the "clearly erroneous" standard. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). The substantial evidence standard means once an ALJ finds facts, we can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.1994) (emphasis added and quotation marks omitted); *see also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994) (using the same standard in the analogous immigration context).

*Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447–48 (2d Cir. 2012)

### IV. DISCUSSION

As noted above, Plaintiff has made only a single claim of error, although it has multiple subparts. He questions the ALJ's reliance on what he characterizes as a "stale" review (that of the state agency reviewer, T. Bruni) and raises several issues with respect to the ALJ's treatment of Dr. Ippolito's opinion. The Court will begin its analysis of Plaintiff's claim by setting forth the ALJ's decision-making process in some detail.

The ALJ first found that Plaintiff's description of his symptoms and limitations was not fully consistent with the evidence - a finding that Plaintiff does not contest. He specifically determined that "when compliant with treatment, the claimant's mental impairments have generally responded well to outpatient counseling, group meetings, and psychotropic medication management," and cited to the treatment notes from 2016 and 2017 to support that conclusion. (Tr. 17). He then analyzed Dr. Ippolito's report and contrasted some of her findings with those of Dr. Bruni, who, unlike Dr. Ippolito, thought that Plaintiff was only moderately limited in his ability to work in proximity with others and in his ability to complete a workday and work week without interruption from psychologically-based symptoms. (Tr. 17-18). The ALJ also noted Dr. Bruni's conclusion that Plaintiff had a sufficient ability to deal with stress so that he could cope with minor changes in the workplace and to understand and carry out simple procedures, as well as to engage in routine social interactions essential to work performance. (Tr. 18). It was this opinion to which the ALJ gave "very significant weight" and which he believed to be consistent with his residual functional capacity determination. He gave lesser, but still significant, weight to Dr. Ippolito's opinion, but also pointed out that it was only relatively, rather than totally, consistent with the medical evidence, and apparently gave the most weight to the portions of her opinion which were consistent with Dr. Bruni's.

Plaintiff first argues that the ALJ erred in giving "very significant weight" to the opinion of the state agency reviewer because that opinion did not take into account any mental health treatment records created after April, 2016. He couples that argument with the contention that although the ALJ gave significant weight to Dr. Ippolito's opinion as well, the ALJ did not explain how he resolved the conflict between his residual functional capacity finding and Dr. Ippolito's conclusion that Plaintiff had a marked impairment both in his ability to deal with others and his ability to cope with stress. Plaintiff asserts that the way that the ALJ circumscribed his social contact and restricted him to simple, repetitive tasks did not adequately account for the limitations found in Dr. Ippolito's report.

It is true that the state agency reviewer's opinion was rendered fairly early on in the administrative process (although it followed Dr. Ippolito's consultative examination) and that there are additional records of mental health treatment which neither of those sources had an opportunity to consider. However, it is not error to rely on an opinion that predates additional medical evidence if that evidence does not indicate any material change in the claimant's medical condition or the severity of his symptoms. *See Daryle O. v. Kajakazi,* 2021 WL 3077891, *5 (W.D.N.Y. July 21, 2021). Plaintiff does not point out any portion of the subsequent record which undermines Dr. Bruni's opinion and, in fact, relies heavily on Dr. Ippolito's opinion even though it was rendered before Dr. Bruni's. There is therefore no merit to this portion of Plaintiff's argument.

The remainder of Plaintiff's arguments fare no better. He bases much of his claim on the proposition that the ALJ adopted Dr. Ippolito's opinions about his ability to relate to others and to deal with stress, but that is simply not the case. The ALJ explicitly recognized that Dr. Bruni, who reviewed and critiqued Dr. Ippolito's opinion, differed in her views on these issues, and the ALJ gave greater weight to Dr. Bruni's conclusions. To the extent that the ALJ's residual

functional capacity determination differed from Dr. Ippolito's, that difference is explained both by the ALJ's greater reliance on Dr. Bruni's opinion and by the ALJ's own review of the mental health treatment notes which showed only moderately severe symptoms.  Those notes, including ones from Plaintiff's treating physician showing that his depression was responding to medication, and the rating of his GAF as 51, which is indicative of moderate symptoms, support the ALJ's decision to give more weight to Dr. Bruni's opinion.  The ALJ's finding that Plaintiff could work in tandem with eight or nine people but have only occasional contact with co-workers and supervisors was supported by Plaintiff's own testimony that he would not be bothered much by being around eight or nine people in a large room.  (Tr. 39).  The record therefore contains substantial evidence to support both of these findings, and the Court does not agree that the ALJ did not sufficiently explain his decision on these issues.  Since substantial evidence exists to justify the ALJ's decision, and the ALJ did not commit the procedural errors which Plaintiff alleges, the Court will therefore sustain the ALJ's decision.

## V.  CONCLUSION AND ORDER

For the reasons set forth in this Opinion and Order, the Court **DENIES** Plaintiff's motion for judgment on the pleadings (Doc. 10), **GRANTS** the Commissioner's motion (Doc. 14), and directs the Clerk to enter judgment in favor of the Defendant.

        **/s/ Terence P. Kemp**
        **United States Magistrate Judge**